(*Recorder's Court of Chicago.*)

### People ex rel. William Green

#### vs.

### Bradley, Deputy Sheriff, et al.

(April 11, 1870.)

1. OFFICERS—DE FACTO—WHO ARE. An officer *de facto* is one who has the reputation of being the officer he assumes to be and yet is not a good officer in point of law.
2. SAME—THEIR ACTS—WHEN THEY CAN BE ATTACKED. The official acts of a *de facto* officer are valid as to third persons who employ him until there has been a judicial determination that his

title is bad in law, except in cases where the *de facto* officer is himself sued for an injury inflicted on a third party, or where the third party knowing of the defective title should employ such an officer for a sinister purpose.

3. SHERIFFS—ABSCONDING—EFFECT ON DEPUTIES.   Where a sheriff absconds with no intention of returning, while the deputy may perform duties as sheriff, yet he does so with many limitations, *e. g.* he cannot remove a jailor, because that is a discretion vested in the sheriff himself, and also many remedies given by law against the sheriff and his bondsmen are unavailing against the deputy in such a case.

4. SAME—VACANCY—RELATION OF DEPUTY AND CORONER THERETO. Under the law of Illinois when the office of sheriff becomes vacant for any reason, the rights of the deputy are not extended beyond the term of his principal, but the coroner becomes the successor of the sheriff until the vacancy is filled by an election as required by law.

5. SAME—SUCCESSION OF CORONER TO OFFICE OF—JUDICIAL NOTICE. When the occasion arises for the coroner to assume the sheriff's office, it takes no judicial proceeding to determine his right. It is a question of fact and if the office actually becomes vacant, and the coroner's right to the office is interfered with, he is entitled to the summary process of the courts, which always take judicial notice of their own officers.

6. SAME—REMOVAL FROM COUNTY—VACANCY—CONSTRUCTION OF STATUTE IN REGARD THERETO.   The statute which provides "If any officer of a county shall remove from and permanently reside out of the same, his office shall be deemed vacant * * * " means that the office of any county officer becomes vacant whenever he leaves the county with no present intent of returning, and it does not have to be shown that he has actually taken up a permanent residence somewhere else.   Such a removal is equivalent to a voluntary resignation.

7. IMPRISONMENT—RIGHT TO HOLD PRISONERS WHERE SHERIFF HAS ABSCONDED.   The coroner and not the deputy sheriff is the person whose duty it is by the law of Illinois to hold a prisoner, where the sheriff has absconded.

8. HABEAS CORPUS—PRACTICE—CASE WHERE RESPONDENT NOT ENTITLED TO HOLD PRISONER BUT SOME OTHER PERSON IS.   A prisoner while entitled to *habeas corpus* under the Illinois statute when he is held by an officer not entitled to do so will not be discharged when this fact is shown but will be turned over to the proper officer; so in the present case the prisoner will be taken out of the hands of the respondent, a deputy sheriff, whose principal has absconded, and put into the hands of the coroner.

Petition for habeas corpus. Heard before Judge McAllister. The facts are stated in the opinion.

*Francis Adams,* for the relator.

*Sidney Smith,* for Conrad Foetz, acting jailer.

*Charles H. Reed,* state's attorney.

McALLISTER, J. :—

The habeas corpus act of this state contains the following provisions applicable to this case: "If it appear that the prisoner is in custody by virtue of process from any court *legally* constituted, he can be discharged only for some of the following causes:" enumerating seven distinct heads, under the fifth of which is this: "Or when the person having the custody of the prisoner *under such process, is not the person empowered by law to detain him."* Our statute is broader than that of any state or country of which I have any knowledge, and the provision just quoted was, no doubt, dictated by the spirit of an advanced civilization, and founded in a policy springing from the teachings of history: that it is far better than even persons guilty of crime should escape than that they should be subjected to the power of irresponsible keepers.

The theory of the relator's counsel is, that respondent was at first but the mere bailiff of Gustav Fischer, late sheriff; that long anterior to relator's commitment Fischer absconded from the state with the manifest intention of not returning to the same, which was a matter of public notoriety, and especially known to respondent; and that by the statutes of this state the coroner who had demanded the possession of the jail, was *ex officio* sheriff, and the authority of the respondent superseded; and, that, therefore, he is not *the person empowered by law* to detain relator. The counsel for respondent replies that he is an officer *de facto,* and all his acts are valid and legal. As the habeas corpus act requires his discharge if the prisoner is detained by a person *not empowered by law* to do so; and as it is essential to the very idea of an officer *de facto* that he is not a good officer *in point of law,* there is great difficulty in the question, and in fact there are other questions involved, which require for their investigation, time

and befitting opportunity, which the pressing and distracting nature of my duties will not allow.

It has been argued with much plausibility, that the expression, "the person empowered by law to detain him," necessarily means a good officer in point of law—an officer *de jure* —such an officer as may enforce any necessary and proper discipline with a legal justification on the part of the officer and without any for resistance on the part of the prisoner, and that, as the court is clothed with the power by the habeas corpus act to determine the main question, it may also determine all of the incidents.

As it will happen that persons assume to act, and are reported to be public officers, when they are not good officers in point of law, and third persons and the public will employ them, a rule of public policy, founded in consideration of preventing a failure of justice, has been adopted, and such third persons are presumed to be ignorant of the existence of the matters which in point of law render them not officers *de jure* —not legally invested with the office. While the acts of such *de facto* officers are held valid as to third persons, or the public, thus presumed to be ignorant of their defect of title, the same principle cannot apply when the officer *de facto* is himself sued for an injury to third persons; nor woud his acts be valid as to any third person, who, having full knowledge of his defect of title, should employ him for any sinister purpose. If Gustav Fischer had absconded with the manifest intention of never returning to this state, and that act, under the statutes of this state, rendered his office vacant, by force of the statute itself, and if respondent knew the fact, then, even conceding that he was an *officer* originally, and, as to third persons presumed to be ignorant of the fact, to be regarded an officer *de facto,* he could not, if indicted or sued for false imprisonment preclude inquiry into the facts which defeated his title. His acting as such would be *prima facie* evidence that he was such officer, but only *prima facie* and subject to be rebutted. *Commonwealth v. Fowler,* 10 Mass. 290; *Courser v. Powers,* 34 Vt. 517, 1 Am. Law Reg., New Series, 268.

The law on this subject is perfectly harmonious. It holds

that when a person, under color of authority, acts and is reputed as a public officer, then as to all third persons, or strangers, as it is sometimes expressed, he will be deemed an officer *de facto,* as to such third persons or strangers his acts will be valid and cannot be impeached collaterally, unless there has been a direct proceeding against such *de facto* officer, or the person from whom he derives his authority, and in whose name he acts, in a court of competent jurisdiction, the facts judicially ascertained, and the proper judgment pronounced; then as everybody within the sovereignty from which the court derives its powers is chargeable with notice of such judgment, the presumption of ignorance of the defect of title ceases and the acts of such reputed officer are not valid, even as to third persons or strangers. It has been frequently said in reference to the acts of the deputies and bailiffs of the absconded sheriff, that they are *de facto* officers, and everything is precisely as well as if the sheriff had not so absconded. In my judgment, this is a mistaken idea of the matter. Their acts are valid to the extent I have indicated. It would be just as proper to say that a limb with a severe wound, and a surgeon's patch upon it, was just as good as a sound one. The very idea of a *de facto* officer is to cover a defect until soundness can be secured, and the unsoundness is implied in the term itself. The authoritative definition of such officer is that given by Ellenborough, C. J., in the case of *King v. The Corporation of Bedford Level,* 6 East, 363: "An officer *de facto* is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." The only case relied upon by counsel for respondent is that of *Ballance v. Loomis, et al.,* 22 Ill. 82, which, it is claimed, decides that the office of sheriff, although he may have absconded never to return remains the same in the hands of his deputies.

That was a case where the deputies were the reputed deputies of the abscondent and acted as such in levying an execution, and the court held that, until the office of sheriff was declared vacant by a direct proceeding against him in a court of competent jurisdiction, or until an election was held and

a successor elected and qualified, the acts of the deputies
would be valid as to third persons who were presumed ignor-
ant of the fact which superseded their authority.   The supreme
court do not say, in that case, that their acts were as valid as
if the event had not happened—that they were good officers
in point of law but say that "they were officers *de facto,*
and while acting as such, their official acts will not be in-
quired into in a collateral proceeding, and all their acts must
be held binding until the office of their principal was va-
cated by a direct proceeding."   This is familiar law, and all
it means is, that third persons are not chargeable with knowl-
edge of the defect of title, and are presumed to be ignorant
of it until such direct proceeding is had.   "But where it is
for the benefit of strangers or the public *who are presumed
to be ignorant* of such defect of title, it is good."—Cro. Eliz.,
69; *King v. Lyle,* Andrews R. 163; *Hipsbey v. Tuche,* 2 Le-
vinz, 184; *Rodman v. Harcourt et al.,* 4 B. Monroe, 233.

But when our supreme court held deputies to be officers *de
facto* when the sheriff had absconded, it used the term under-
standingly, and it is in effect saying that they were persons
who had the reputation of being the officers they assumed to
be, "and *yet were not good officers in point of law.*"

It will be apparent that in such case the public are de-
prived of very important rights in not having a sheriff or one
who *ex officio* performs his duties and is subject to his liabili-
ties.   A deputy sheriff may perform the duties which the
sheriff is required to perform.   But there are many limita-
tions.   He cannot appoint a bailiff any further than to do a
particular act.   *Hunt v. Burrel et al.,* 5 Johns. 173.   He
cannot remove a jailor, because that is the exercise of a dis-
cretion vested alone in the sheriff.   Neither could he appoint
one.   If, therefore, the jailor were ever so negligent, cruel, or
oppressive, Mr. Bradley could not remove him.   The summary
remedy given by the statute to a party to an execution,
against the sheriff or coroner for not paying over moneys col-
lected cannot be enforced against the deputy.   So as to the
same remedy given to the county court or auditor of the state
for not paying over taxes collected.   He (the sheriff) is iden-

tified in contemplation of law with all his under officers, *and is directly responsible in the first instance* for all their acts done in the execution of process.'' 2 Greenleaf, Ev. sec. 480, and note 1.

The case of *Paddock v. Cameron,* 8 Cowen, 211, is much in point in showing how the public are exposed under this state of things, and who ought to perform the duties of sheriff. The statutes of New York were in many respects precisely like ours. This was an action on the case against the defendant, as under sheriff of the county of Warren, for a false return to a writ of *fi. fa.* It appeared on the trial, that the defendant was the under sheriff of Dudley Farlin, Esq., who (instead of absconding with a harlot) was, at the fall election of 1823, elected a member of assembly, and his office, therefore, vacated by statute, on the 1st of January, 1824. The defendant exercised the office of sheriff until a new one was elected in March, 1824. The *fi. fa.* was delivered to the defendant on the 23d day of January, 1824. A verdict was found for the defendant. A motion was made for a new trial on several grounds, and opposed on the ground, among others, that the defendant's office of under sheriff expired with that of Mr. Farlin, the sheriff. Woodworth, J., delivering the opinion of the court, said: ''I do not consider it necessary to examine the question whether the evidence sufficiently establishes the fact of a false return; being of opinion that this action does not lie against the under sheriff. The general rule is, that an action will not lie against an under sheriff, for a breach of duty in his office, although he may, as well as any other agent, make himself personally responsible by a special undertaking. *Cameron v. Reynolds,* Cowp. 403; *Tuttle v. Love,* 7 Johns, 472. The inquiry then is, whether a case like the present is provided for by the statute? (1 R. L. 418, 420, sec. 5.) By this act, it is declared that the sheriff shall appoint an under sheriff, and *in case of the death* of the sheriff, the under sheriff shall in all things execute the office of sheriff until another sheriff shall be appointed;    *    *    *

''The act farther provides that if there be no under sheriff at the time of the death of the sheriff, or if such under

sheriff shall die, or remove out of the county, or become incapable of executing the office before another sheriff shall be appointed, in every such case the coroner or coroners shall, in all things, execute the office of sheriff, until a sheriff shall be appointed and take upon himself the office. The act specifies only the natural death of the sheriff. That did not happen; and consequently, the defendant derived no authority, under this statute, to take the place of the sheriff. Whether the county, on the election of Mr. Farlin to the legislature, were left without any person to discharge the duties of sheriff, is not material to the point before us. It is enough that the defendant had no authority to act. *I incline, however, to the opinion that, by a reasonable construction of the statute, the right to discharge the duties of sheriff devolved on the coroners;* inasmuch as one of the contingencies upon which this right depends is, that the under sheriff becomes incapable of executing the office. This event has taken place. Motion denied.''

And if there is any remedy against the bondsmen of the absconded sheriff, under the circumstances, what it is, is a matter of doubt and difficulty. And there is still another injury to the public. No one taking a false oath as to qualification of bail, before the deputy *de facto,* can be punished for perjury. We had just such a case last term, and the state's attorney, under direction of the court, dismissed the prosecution. On the authority of *Rex v. Verenet,* 3 Camp. 432, 1 Hawk P. C. ch. 69, sec. 4, holding that where the action of an officer was made the foundation of an affirmative criminal proceeding, although Mr. Bradley's acting as deputy was *prima facie* evidence, yet it might be rebutted, and his strict legal title inquired into. The truth is, that when the gearing is substantially disarranged, the harmony of the machinery must necessarily be broken.

We now recur directly to the question: Is the respondent the person empowered by law to detain the prisoner? And this, upon the theory of relator's counsel, requires us to consider the question whether the contingency has happened which renders the coroner *ex officio* sheriff, and, if it has,

whether the court is compelled to discharge the prisoner irrespective of his guilt or innocence. These are grave questions, and in which the public have great interest. After a careful examination of the statutes, I am satisfied that the contingency has happened which would authorize the county clerk to notify the governor of the fact of a vacancy in the office of sheriff, and, if that be so, what is the relation of the coroner to the office of sheriff? It is the manifest purpose of the several statutes on this subject to give us a complete system for the regulation of so important an office as that of sheriff, and to preserve the county from the inconvenience of an *interregnum* in the office, and which necessarily abrogates a part of the common law. And it is to be observed that there is only one case in which a deputy sheriff has his powers extended beyond that of his principal, and that is the case of death; in all others these powers devolve upon the coroner. The offices of sheriff and coroner are intimately blended. The very title of the statute is "Sheriffs and Coroners." Their official bonds are defined in the same section, and the coroner's first bond is conditioned for the faithful discharge of all the duties required or to be required of him by law, *as sheriff*, or coroner, and his official oath is for both offices. Writs are to be directed to him when the sheriff is interested, and he is to take possession of the jail when the sheriff is a prisoner in it. Then, in the eighteenth section of the same act is this provision: "In case a vacancy in the office of sheriff, by death, resignation, removal, *or otherwise*, the coroner shall do and perform all the duties pertaining to the office of sheriff, receive the proper fees and emoluments, and be liable to the same penalties and proceedings as if he were sheriff, until such vacancy shall be filled by the election and qualification of a new sheriff."

The object of this provision is, that the courts may always have a known chief executive officer; that parties to suits, taxpayers, the county and the state, may always have the benefit of those stringent remedies provided by law for the security of private and public moneys. And, we may ask, can any legal mind, contemplating all of these statutes, per-

ceiving their objects and purposes, arrive at the conclusion that the coroner cannot, when the contingency happens that by any provisions of law render the office of sheriff vacant, and the same becomes practically vacant, assume the duties of sheriff, without first having a direct proceeding against the sheriff, by information in the nature of a *quo warranto*, and have a court of competent jurisdiction to declare it vacant, requiring months, if not years of time? Conceding that jurisdiction could be obtained of an absconded sheriff, whose whereabouts were unknown (which is extremely doubtful, 44 Ill. 458), is any such idea fairly within the intention of the statute? In my judgment it is not. Because, then, the statute should read, "In case of a vacancy in the office of sheriff by *removal* of the incumbent," which would mean by direct proceeding. But this statute includes a vacancy by death (when there could be no judgment), by resignation, by removal, *or otherwise,* which includes every species of vacancy. It matters not that a fact is to be found. It would be so in case of death. It is easy to determine that a man is dead if we see his corpse; but suppose he dies at sea, or in a distant land among strangers. Then the fact is as difficult of proof as resignation or removing out of the county with intention to permanently reside out of the same. There is no regulation by statute as to how the sheriff shall resign his office. Every civil officer has the right to resign his office whenever he pleases. *United States v. Wright,* 1 McLean 509. He may resign it by parol. Suppose Gustav Fischer had decided to leave this state and go back to Germany to spend the rest of his life, and, before leaving, had taken deputy Bradley and respondent Folz to the office of the county clerk, and there told the clerk that he resigned his office, delivered his farewell address to his constituents, and left. Would it be necessary for the coroner to file an information to have the office vacated before he could assume its duties? Clearly not. Because it would not, in that case, be a vacancy by resignation, but by removal of the incumbent by judgment. If it be asked how the coroner is to get possession of the jail and the office if the deputies resist, I

answer, by the summary power of the courts, who are bound to take judicial notice as to who is their chief executive officer. "The court will, *ex officio*, take notice of it. A court is presumed to know its own officers and all public officers in civil affairs within its jurisdiction—*certainly the sheriff of its own court.*" *Thompson v. Haskell*, 21 Ill. 216. Then again: "Even if the court was not bound to take notice of the death of its chief executive officer, it was competent to receive proof of that fact and to decide upon such proof." *Timmerman v. Phelps*, 27 Ill. 196. It is the duty of the courts to see that their process, both *mesne* and final, should be directed to their chief executive officer, and to do so they have all the power of determining who he is. Nobody ever contemplated the contingency of a mere deputy setting up a right to any office. "A deputy has no interest in the office, but is only the *shadow* of the officer in whose name he does all things." Jac. Law Dict. title "Deputy." Suppose a new sheriff should be elected, and this bailiff or a deputy still refuses to surrender the office, and demand that the office of his principal should be first vacated by a direct proceeding, which could be kept off till the term expired, would the courts still place their process into his hands, and recognize his returns in the name of Gustav Fischer?

The statute provides that "If any officer of a county shall remove from and permanently reside out of the same, his office shall be *deemed vacant,* and such vacancy *shall be filled* as in other cases." "Deemed vacant," by whom? Not necessarily only by a court; but the meaning may be ascertained by the context, "and such vacancy *shall be filled* as in other cases." How is a vacancy to be filled in other cases? The statute furnishes the answer, "That whenever a vacancy shall happen in the office of sheriff, etc., by death, resignation, or removal of the incumbent, it shall be the duty of the clerk of the county immediately to notify the governor *of the fact,* and it shall be the duty of the governor to issue a writ of election to fill such vacancy."

And here we may also remark that if it had been the intention of the legislature to confine the county clerk to only the

case of a removal by direct proceeding, the words *removal of the incumbent* would have sufficed; but the words by death, by resignation, are also included, which render such a construction unreasonable and against the plain meaning of the statute. Then, to make the system complete, and to secure to the courts a chief executive officer, and to protect private parties and the public, comes in the other provision, making the coroner *ex officio* sheriff "*until* such vacancy shall be filled by the election and qualification of a new sheriff."

Now, what is the fair meaning of the statute above quoted in reference to county officers removing out of the county? The object is apparent, and that was simply to secure the residence of county officers, not only in the state, but in the county where they were elected, that they might be subject to the penalties and proceedings provided by law, and I am satisfied, from a careful consideration of these objects, that if a county officer absconds from the state with the intention (which is to be inferred from the circumstances) of never returning to it, then the contingency has happened which renders his office vacant, and the public are not bound to wait until he becomes permanently settled elsewhere. Suppose he commits a murder and manages to escape to Canada, are the authorities of the county bound to wait until his haunted conscience will permit him to find a resting-place? Why should there be such tenderness exhibited towards an absconding public officer who has proved so wickedly recreant to a sacred public trust—to his duties to family and society? The evidence in this case leaves no shade of doubt in any reasonable mind, and, indeed, it is a matter of public notoriety, that Gustav Fischer, on the 15th day of December last, absconded from this state under such circumstances as preclude the idea of his ever returning to it. Suppose he had been a defaulter to the amount of fifty or a hundred thousand dollars and absconded, or suppose he had committed a highway robbery and escaped, would there be any doubt of his intention of keeping away from here? For the sake of the public morals, I forbear the rehearsal of the evidence in this case. He had thoroughly outraged and ruptured his family relation. He had

squandered his means upon a harlot, with whom he eloped, and was hopelessly insolvent. He told various false and conflicting stories, as to where and for what purpose he was going. He obtained large sums of money by fraud. He deceived and defrauded his best friends into signing his paper, and thus betrayed their confidence. His return to this state is simply impossible, if he is sane, and he is, it is to be so presumed.

The effect of such voluntary removal is a virtual or constructive resignation of his office. In *Ferguson v. Lee,* 9 Wend. 258, where there was a simiar statute, a deputy sheriff removed into another county. Savage, Ch. J., says: "In this case Haddock. who had made the levy as under sheriff of Herkimer, had, intermediate the levy and sale, removed to Oneida county. This was *a virtual resignation* of his office; it was a voluntary withdrawal from the county, which, *by the statute, vacated his office.*" Not by the judgment of the court on information in the nature of a *quo warranto;* but "by the statute."

In the case of the *State v. Allen,* 21 Indiana, 521, the court says: 'An office may be vacated, be abandoned, which is *constructive* resignation. An office may be resigned by parol, and, of course, *acts* may speak that resignation." Also, *Bernard v. Hoboken,* 27 N. J. L. 412.

That the respondent knew the facts which constitute such virtual resignation is manifested by the very clearest evidence, viz., the sealed articles of agreement of the 26th of January, 1870. I have not space to present an analysis of these articles, but suffice it to say they are virtual administration of the estate of Gustav Fischer, and are based upon a clear assumption that he had absconded not to return. They recite the fact of his having left, and of the refusal of his bondsmen to be further bound; they are *tri partite.* The parties of the first part are twenty-three creditors of Fischer, among whom is respondent, representing $34,128.90 of indebtedness against him. The parties of the second part are the bondsmen, and of the third part T. M. Bradley and W. F. Wentworth. They assume to take possesion and control,

not only of the office, but of all of Fischer's estate, Schedules of assets and liabilities, formal enough for the probate court, are carefully prepared and made a part of the articles signed by Bradley Wentworth and John Mattocks. Among the items of assets is the folowing: "Estimate of office for ten months, $15,000." Bradley is to be the chief administrative agent. This may be an ingenious manner of collecting bad debts, but it manifests some indifference to the rights of the public and the law of. the land, and looks very much as if it was against public policy. But these are the very parties who now insist that nothing has happened which warrants a court in finding that Fischer has absconded with the intention of not returning. Mr. Bradley says he did not sign these articles. But he did sign the schedules. He is named in them as a party, and had them in his possession at the time of the hearing.

Whom, then, is the court, under the evidence and authority of our supreme court, to regard as its chief executive officer? Gustav Fischer, who has absconded and had his estate extra judicially administered upon by the very parties who resist this application; or is it the coroner, whom the law designates as the proper officer to perform the duties of the office, and be liable to the penalties and proceedings as if he were sheriff, until one shall be elected? I have no hesitation in saying it is the latter.

Respondent cannot be considered an officer *de facto,* because he is not a general public officer, but the mere agent and special officer of the late sheriff. In *Dake v. Sykes,* 7 Term, 117, Lawrence, J., says: "The admission of the under sheriff may affect the high sheriff, because he is the general officer of the sheriff; but I do not think that the bailiff is his general officer. When a warrant is granted him, he becomes the special officer of the sheriff, and I have always understood it to be necessary to produce the warrant to show the relation." Crocker on Sheriffs, 11. He takes no oath and is required to give no bond. *King v. Bedford Level,* 6 East, 356.

The court is required in this proceeding to determine who

is the person empowered by law to detain the prisoner; and to do so it is necessary to determine whether the former relations between him and Fischer have not been dissolved. I am satisfied that they have been. · If the court has no power to determine this question in this way, then an unauthorized keeper of a jail could always keep possession. Proceedings · *quo warranto* would not lie against him, because he is a mere agent or special officer. If the relation has been dissolved, then he has no authority. *Boardman v. Halliday,* 10 Paige, 223; *Edmunds v. Barton,* 31 New York, 495. The practice is where a prisoner is detained by one not authorized by law to detain him, and there is another person who is, to remand him to the custody of the one so authorized. The prisoner is accordingly remanded to the custody of the coroner.